## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUN 0 9 2025

TAMMY H. DOWNS, CLERK

By: _____
DEP CLERK

PHARMACEUTICAL CARE
MANAGEMENT ASSOCIATION *and*
NAVITUS HEALTH SOLUTIONS

    *Plaintiff,*

vs.

ARKANSAS STATE BOARD OF
PHARMACY; RODNEY RICHMOND,
BRIAN JOLLY, DEBBIE MACK, LENORA
NEWSOME, CLINT BOONE, LYN
FRUCHEY, HAROLD H. SIMPSON, *and*
BETH ANN DAVENPORT, *in their official
capacities as members of the Arkansas State
Board of Pharmacy;* and JOHN KIRTLEY,
*in his official capacity as Executive Director
of the Arkansas State Board of Pharmacy,*

    *Defendants.*

Case No. 4:25 cv 561 BSM

This case assigned to District Judge Miller
and to Magistrate Judge Harris

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

David S. Mitchell, Jr. (Ark. Bar No. 2010271)
  Rose Law Firm,
  a Professional Association
  120 East Fourth Street
  Little Rock, AR 72201
  (501) 375-9131
  dmitchell@roselawfirm.com

Tyler D. Mlakar (Ark. Bar No. 2022150)
  Rose Law Firm,
  a Professional Association
  809 S. 52nd St., Ste. A
  Rogers, AR 72758
  (479) 301-2444
  tmlakar@roselawfirm.com

Michael B. Kimberly*
Linda M. Blair*
  Winston & Strawn LLP
  1901 L Street NW
  Washington, DC 20036
  (202) 282-5096
  mkimberly@winston.com
  lblair@winston.com

\* *pro hac vice* motion forthcoming

Plaintiffs the Pharmaceutical Care Management Association (PCMA) and Navitus Health Solutions (Navitus) bring this complaint against the Arkansas State Board of Pharmacy (Board of Pharmacy); Rodney Richmond, Brian Jolly, Debbie Mack, Lenora Newsome, Clint Boone, Lyn Fruchey, Harold H. Simpson, and Beth Ann Davenport, in their official capacities as members of the Board of Pharmacy; and John Kirtley, in his official capacity as Executive Director of the Board of Pharmacy, and alleges as follows.

**TABLE OF CONTENTS**

Introduction ................................................................................................................ 2

Parties ....................................................................................................................... 7

Cause of Action, Jurisdiction, and Venue.......................................................... 8

Factual Allegations................................................................................................. 8

    A.  PBMs play an indispensable role in administering prescription drug benefits and keeping drugs affordable.................................................. 8

    B.  Many PBMs have direct or indirect interests in pharmacies with permits to do business in Arkansas ............................................................. 12

    C.  Act 624 requires the Board of Pharmacy to deny or revoke pharmacy permits held directly or indirectly by PBMs ........................................ 12

    D.  In both purpose and effect, Act 624 erects a legal barrier to protect local businesses from competition by out-of-state businesses ................... 14

    E.  Act 624 inflicts legislative punishment on a discrete and specifically targeted group of companies for asserted violations of law ................ 18

    F.  Act 624 will inflict textbook irreparable harms ................................. 22

Causes of Action .................................................................................................... 24

    Count 1: Unconstitutional Economic Protectionism ................................ 24

    Count 2: Unconstitutional Bill of Attainder............................................. 30

Prayer for Relief..................................................................................................... 32

## INTRODUCTION

1.      Healthcare spending in the United States reached $4.9 trillion, or $14,570 per person, in 2023. As a share of the nation's gross domestic product, it now accounts for an astounding 17.6 percent. And around nine percent of that total, $450 billion annually, is attributable to prescription drugs. *See* Centers for Medicare and Medicaid Services, *National Health Expenditures 2023 Highlights*, https://perma.cc/UKM9-Z8JG.

2.      Pharmacy benefits managers (PBMs) play a vital role in helping to contain these ballooning costs. Nearly all prescription drug purchases in America are covered by some form of prescription-drug insurance. Such insurance may be offered as a fringe benefit sponsored by an employer or union, or as a public benefit furnished under a federal benefit program like Medicare or Medicaid. No matter the case, the task of designing and administering these prescription-drug benefits is stunningly complex. A benefit sponsor must (among other things) identify which drugs should be covered; determine how costs should be shared between the plan and its participants; negotiate with manufacturers and wholesalers over drug pricing and rebates; contract with thousands of "in network" pharmacies and negotiate how they will be reimbursed; develop a system for processing countless claims instantaneously at the point of sale; and provide for legally mandated notices, appeal procedures, and myriad other administrative requirements and tasks.

3.      The resulting administrative burden is prohibitive for almost all sponsors of prescription-drug benefit plans, both public and private. Sponsors thus almost always turn to PBMs to help them design and administer their benefits. PBMs vie for business in a competitive marketplace to offer plans and the most robust services at the lowest possible prices, allowing sponsors to offer affordable prescription drug coverage to their beneficiaries. As administrative agents who advocate on behalf of plan sponsors, PBMs play an

essential—albeit poorly understood—role in the delivery of prescription drug medications to nearly all Americans.

4.      One tool that PBMs typically recommend to keep prescription-drug costs low is encouraging plan enrollees to use PBM-affiliated retail pharmacies, mail-order pharmacies, and specialty-drug pharmacies. As a general matter, affiliated pharmacy services help lower costs by reducing overhead and achieving better economies of scale. And close affiliations between PBMs and mail-order and specialty pharmacies create leverage and synergies that allow for more effective quality control, better patient adherence programs, and more favorable terms in pricing negotiations with manufacturers—benefits that are not possible when PBMs are working with independent pharmacies over which they have limited oversight. Simply put, the affiliation of pharmacies with PBMs means better health outcomes for patients at lower costs to plan sponsors.

5.      But not everyone is pleased with this arrangement. Independent pharmacies, which include many regional chains, are often unable to achieve the same efficiencies as PBM-affiliated pharmacies. Their smaller scale means that they generally must pay more to acquire drugs at wholesale, and their less sophisticated data and communications systems make patient monitoring and drug-regimen support more challenging. They also generally lack the resources and capabilities to finance, store, and properly dispense expensive, high-touch specialty drugs.

6.      Rather than innovating and attempting to compete with PBM pharmacies on the merits, many independent pharmacies have turned to state lawmakers to manipulate the market with the heavy hand of government, to artificially tip the scales of competition in their favor. State lawmakers—many of whom have personal connections with independent pharmacy lobbyists—have, in turn, been happy to comply.

7.      One of the more common tactics these lawmakers have adopted to favor independent pharmacies is regulating prescription-drug benefit design. For example, they often have forbidden plans from using preferred pharmacy networks that include PBM-affiliated pharmacies; or mail-order networks limited to PBM mail-order pharmacies. *See, e.g.*, *PCMA v. Mulready*, 78 F.4th 1183, 1191 (10th Cir. 2023); *PCMA v. Wehbi*, 18 F.4th 956, 965-966 (8th Cir. 2021). But these provisions are unquestionably preempted as applied to Medicare plans and self-funded employee benefit plans covered by the Employee Retirement Income Security Act of 1974. Their impacts have thus been limited.

8.      Unable to regulate benefit design directly, Arkansas lawmakers have attempted a different tack with Act 624, which is the subject of this suit. Rather than focusing directly on the terms of prescription-drug insurance coverage, Act 624 regulates who is permitted to provide pharmacy services in the state *at all*. In short, it forbids PBMs from holding or acquiring, directly or indirectly through an affiliated pharmacy, an interest in a permit to run a pharmacy in the state of Arkansas. As a corollary, no pharmacy in which a PBM has a direct or indirect interest will be allowed to acquire or maintain a permit or license to operate a pharmacy for the manufacture, sale, or distribution of drugs in the state. In practical effect, Arkansans will be unable to obtain prescriptions from PBM-affiliated pharmacies beginning January 1, 2026.

9.      The effects of Act 624 are mind-spinning. More than 40 retail pharmacies employing more than 600 Arkansans will lose their permits by year's end. These retail locations alone fill *millions* of prescriptions for *hundreds of thousands* of Arkansans every year. In addition, every PBM mail-order pharmacy will lose its license to deliver drugs to patients in the state, shutting off a regular and reliable supply of lifesaving drugs for hundreds of thousands of additional Arkansans. The results are perhaps most alarming with

4

respect to PBM specialty pharmacies, which provide the most sensitive and expensive drugs to patients with the most severe conditions. Countless patients and healthcare providers will have to make highly disruptive changes to the way they receive and practice medicine throughout the state.

10.    But PCMA does not bring this suit because Act 624 is bad policy, although it very certainly is. Rather PCMA brings this suit because Act 624 is as clear an example of unconstitutional state legislation as the Court is likely ever to see. In fact, Act 624 is unconstitutional for at least two main reasons.

11.    *First*, Act 624 is a paradigmatic example of unconstitutional economic protectionism.  It is unmistakable in the statutory text and history that Act 624's principal objective is to protect local independent pharmacies from competition by out-of-state PBMs and their associated pharmacies. This kind of naked, state-imposed local protectionism is a clear violation of the dormant Commerce Clause. The Privileges and Immunities Clause points in the same direction, as it protects the right of out-of-state citizens to practice their trades or occupations free from discriminatory local protectionism, the Act's clear aim. This protectionist design and effect violate the core constitutional principle that states may not use their regulatory power to advantage local economic interests at the expense of out-of-state competitors. And in addition to its plainly protectionist aims and effects, Act 624 places dramatic burdens on interstate commerce that are nowise justified by local benefits, flunking the *Pike* balancing test. Unconstitutional discrimination against out-of-state interests is rarely so plain as this.

12.    *Second*, Act 624 is an unconstitutional bill of attainder. The Bill of Attainder Clause—which the Supreme Court has stressed is no anachronism—forbids states from imposing punishments legislatively, without the benefits and procedural safeguards of a

judicial proceeding. That also is what Act 624 does: In form and effect, it wrongly concludes that PBMs and PBM pharmacies have committed undefined antitrust and other administrative violations, imposing a traditional punishment (revocation of a permit to conduct business in the state) as a result. The Framers understood that it is an abuse of power to impose formal punishments as a matter of politics rather than law—and with the Bill of Attainder Clause, they forbade it. Act 624 must fall for this reason, too.

13.    Moreover, the harms that Act 624 will inflict—beginning long before any permits are actually revoked beginning January 1, 2026—are certain to be irreparable. Business relationships will be severed. Retail stores will be closed. Employees will be terminated. None of this can be remedied with a mere award of damages, which would be unavailable in any event because the defendants have sovereign immunity.

14.    The public interest also tips decidedly in favor of a preliminary injunction. As Act 624 wipes away an enormous swath of the prescription-drug marketplace in Arkansas, patients in need of health-sustaining and often life-saving drugs will have their settled supplies and longstanding relationships disrupted. Even those who are able to reestablish access to critical drugs through other means will be able to do so only at greater expense and inconvenience, almost certainly leading to lower drug protocol adherence, worse health outcomes, and higher healthcare costs across the system. The only stakeholders better off will be the local pharmacies who will reap greater profit from ill-conceived legislation designed to pick economic winners and losers.

15.    Against this background, plaintiffs will seek, and the Court should grant, a preliminary injunction barring enforcement of Act 624 against PCMA's members and Navitus while this suit proceeds. That relief is essential while the case advances toward a final judgment holding Act 624 violates the Federal Constitution twice over.

## PARTIES

16.    PCMA is a national trade association organized under Section 501(c)(6) of the Internal Revenue Code and the laws of the state of Delaware. Its institutional mission is to represent the interests of PBMs before lawmakers and in litigation. Its principal place of business is the District of Columbia.

17.    PCMA's member companies administer drug benefits for more than 230 million Americans throughout the nation, including in Arkansas. They include Abarca Health, CarelonRx, CerpassRx, Humana Pharmacy Solutions, LucyRx, Maxor Plus, MedImpact Healthcare Systems, PerformRx, Prime Therapeutics, ProAct, Progyny, Rx Benefits, RxSense, Script Care, Serve You Rx, TrueRx, Waltz Health, and WellDyne, among others.

18.    Most PCMA members hold or have direct or indirect interests in permits and licenses issued by the Arkansas Board of Pharmacy. They or their corporate affiliates currently operate pharmacies in Arkansas and will be denied permits and licenses to continue doing so under Act 624.

19.    Navitus Health Solutions is a PBM that is not a member of PCMA. Its principal place of business is Madison, Wisconsin. Like most of PCMA's members, Navitus has a direct or indirect interest in permits and licenses issued by the Arkansas Board of Pharmacy, and those permits or licenses will be revoked under Act 624.

20.    The Board of Pharmacy is an agency within the Arkansas Department of Health. Its principal place of business is in Little Rock, Arkansas. It is the state agency charged with implementing and enforcing Act 624.

21.    John Kirtley is the Board of Pharmacy's Executive Director. Rodney Richmond, Brian Jolly, Debbie Mack, Lenora Newsome, Clint Boone, Lyn Fruchey, Harold

7

H. Simpson, and Beth Ann Davenport are the Board of Pharmacy's individual members. Each is sued in his or her official capacity only.

## CAUSE OF ACTION, JURISDICTION, AND VENUE

22.    Plaintiffs' cause of action arises under the Civil Rights Act of 1871 (42 U.S.C. § 1983), the Declaratory Judgment Act (28 U.S.C. §§ 2201-2202), the Supremacy Clause of the U.S. Constitution, and the Court's inherent equitable powers.

23.    This complaint arises under and presents questions of federal law. The Court's subject matter jurisdiction is thus invoked under 28 U.S.C. § 1331.

24.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because defendants reside in the district and 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this action occurred in this district.

## FACTUAL ALLEGATIONS

### A.    PBMs play an indispensable role in administering prescription drug benefits and keeping drugs affordable

25.    The process of manufacturing, distributing, dispensing, and paying for prescription drugs is highly complex and involves a number of different stakeholders. Manufacturers make and bring drugs to market; wholesalers purchase drugs in bulk from the manufacturers and distribute them to pharmacies, doctors, and hospitals; and employers, labor unions, the state and federal government, and other sponsors of prescription-drug benefit plans provide insurance coverage for pharmacy services and prescription drugs.

26.    Most Americans obtain prescription drugs with the help of medical insurance plans that include a prescription-drug benefit. The sponsors of these plans are employers, labor unions, and federal, state, and municipal governments.

8

27.     Designing and administering prescription-drug benefit plans is an extra-ordinarily complex and time-consuming undertaking that plan sponsors cannot realistically undertake on their own. *See PCMA v. District of Columbia*, 613 F.3d 179, 183 (D.C. Cir. 2010). Virtually all sponsors of prescription-drug benefit plans, private and public alike, therefore rely on pharmacy benefit managers, or PBMs, to make recommendations for the design of their benefits, to construct the networks of pharmacies to be used under the plan, to process claims, and to perform other critical benefit-administration functions.

28.     PBMs contract with (1) plan sponsors, to help them design and administer prescription-drug benefits for employees and government-program enrollees; (2) manu-facturers, to negotiate rebates on behalf of their plan-sponsor clients; and (3) pharmacies, to help plan-sponsor clients create different groupings of "in network" pharmacies under their benefit plans. *See Rutledge v. PCMA*, 592 U.S. 80, 83-84 (2020).

29.     This case centers on pharmacies as well as PBMs. Many PBMs, including many of PCMA's members, own or have indirect interests in pharmacies. PBM pharmacies offer a number of advantages for plan sponsors, making access to prescription drugs more convenient and affordable.

30.     Pharmacies today operate in one of three primary formats. A **retail pharmacy** is a brick-and-mortar store that employs one or more behind-the-counter pharmacists to dispense prescription drugs. Retail pharmacies can be standalone operations, or they may sell other goods and services beyond just the dispensing of prescription drugs. Many retail pharmacies are embedded within larger operations, such as large grocery stores or big-box retail stores.

31.     Plan sponsors, working with PBMs, typically offer a separate retail pharmacy network where beneficiaries can obtain in-network prescription drugs and services.

32.    Many prescription drugs in Arkansas are dispensed and delivered instead by **mail-order pharmacies,** which offer a number of both economic and practical advantages over retail pharmacies, especially for large, multistate plan sponsors. First, mail-order pharmacies have greater purchasing power and lower acquisition costs. They are therefore typically able to deliver drugs at lower cost (and with lower co-pays for enrollees) than independent retail pharmacies, saving both plan sponsors and their enrollees substantial sums of money.

33.    Second, mail service improves patient adherence to prescriptions because patients obtain 90-day supplies and do not have to travel to the pharmacy or abide by retail hours. Patients also benefit from automatic shipments and refills, which is especially useful for those who must take regular maintenance drugs. Mail-order pharmacies thus often help improve patient adherence and enhance clinical outcomes, indirectly saving the healthcare system additional costs associated with less effective prescription adherence.

34.    Plan sponsors, working with PBMs, typically offer a separate mail-order pharmacy network where beneficiaries can obtain in-network prescription drugs, delivered to their homes or places of work, at lower cost. Often a plan sponsor will elect to have just one mail-order pharmacy in its mail-order pharmacy network, operating uniformly across state lines. When that is so, that pharmacy is typically affiliated with the plan's PBM.

35.    The third and final kind of pharmacy at issue here is **specialty pharmacies,** which are responsible for dispensing "specialty" drugs. Specialty drugs are characterized by their greater expense, potency, or sensitivity. Some require special handling, such as refrigeration. Others are highly photo-sensitive, calling for special packaging. These drugs play a significant and expanding role in the treatment for complex diseases like cancer. Today, they account for more than half of overall drug spending.

36.    Specialty pharmacies are expert in dispensing specialty drugs, which require not only specialized handling (due to kinetic, light, or heat sensitivity), but also patient qualification and monitoring requirements. Indeed, many specialty drug manufacturers limit their distribution of specialty drugs to qualified specialty pharmacies only.

37.    Specialty pharmacies have important benefits for cost, access, and quality of care. First, specialty pharmacies can buy specialty drugs in bulk, with better rates for the plan and its beneficiaries. Second, because specialty pharmacies have additional expertise handling, storing, and advising patients on specialty medications, they generally produce better patient outcomes. Such pharmacies are few in number and high in demand, and they dispense predominantly via mail or other common carrier.

38.    Most mail-order and specialty pharmacy services throughout the nation are provided by PBM-affiliated pharmacies. The close relationship that PBMs have with their mail-order and specialty pharmacies brings numerous benefits. To start, PBMs are able to ensure more effective quality-control and patient-compliance measures with affiliated pharmacies, leading to better outcomes for beneficiaries.

39.    Beyond that, PBMs are able to offer a number of cost-saving plan features and services that would not otherwise be available to plan sponsors without the oversight possible at a PBM pharmacy. For example, when a PBM is able to assure that quality-control procedures are being followed and patient-compliance measures are being implemented, it often can obtain favorable drug acquisition terms from manufacturers, even aside from obtaining lower prices as a result of being able to negotiate at scale. Manufacturers will often warrant the clinical effectiveness of their drugs, for instance—but only when they are given the assurances made possible by PBMs' oversight of affiliated pharmacies.

40.    PBMs routinely contract with independent pharmacies when constructing pharmacy networks, ensuring, among other things, compliance with federal and state network adequacy rules. But the cost-saving terms that PBM-affiliated pharmacies achieve are generally not available, or they achieve substantially less savings, when the PBM uses independent pharmacies, over which they have less effective oversight with respect to quality-control and patient-compliance measures.

**B.    Many PBMs have direct or indirect interests in pharmacies with permits to do business in Arkansas**

41.    Arkansas law requires retail pharmacies to maintain a "resident" pharmacy permit issued by the Board of Pharmacy. *See* Ark. Code Ann. § 17-92-101. It similarly requires out-of-state mail-order pharmacies to hold "non-resident" pharmacy licenses to ship medications into the state. *See* Ark. Code Ann. § 17-92-401. And it requires that any specialty pharmacy hold an additional permit to fill specialty prescriptions. *See* Ark. Code Ann. § 17-92-403(d); Code Ark. R. 007.39.4-04-03-0001.

42.    PCMA's members and Navitus own, operate, or have direct or indirect interests in retail, mail-order, and specialty pharmacies that hold resident pharmacy permits and non-resident pharmacy licenses issued by the Board of Pharmacy. Without these permits and licenses, these PBMs and their affiliated pharmacies could not dispense prescription drugs in the state to plans using the PBM or anyone else.

43.    PCMA's members and Navitus, through their affiliated pharmacies, furnish *many millions* of prescriptions every year to *many hundreds of thousands* of Arkansans.

**C.    Act 624 requires the Board of Pharmacy to deny or revoke pharmacy permits held directly or indirectly by PBMs**

44.    Act 624 was introduced as House Bill 1150 by Representative Jeremiah Moore. It was signed into law by Governor Sanders on April 16, 2025.

12

45.    The bill, as adopted, commences with the non-codified legislative finding that there is "evidence of anticompetitive business tactics that have driven locally-operated pharmacies out of business, limiting patient choices and inflating drug prices at pharmacies owned by pharmacy benefits managers." Act 624 § 1(a)(2). It asserts that Arkansas "wishes to minimize conflicts of interest by stopping the pharmacy benefits managers and healthcare payors acting as a 'fox guarding the henhouse' by being both a price setter and price taker." *Id.* § 1(a)(3). It thus emphasizes that "the basic tenet of this act" is to "improve healthcare delivery in the pharmacy market for patients by eliminating certain anticompetitive business tactics." *Id.* § 1(b).

46.    To that end, Act 624 adds a new Section 17-92-416 to the Arkansas Code. It specifies in relevant part that "[a] pharmacy benefits manager shall not acquire direct or indirect interest in, or otherwise hold, directly or indirectly, a permit under § 17-92-405 for the retail sale of drugs or medicines in this state." Ark. Code § 17-92-416(b). It furthermore bars PBMs from holding or having any interest, direct or indirect, in "a pharmacy permit for a mail-order pharmacy." *Id.* § 17-92-416(a)(1)(B).

47.    Act 624 directs that "the Arkansas State Board of Pharmacy shall either revoke or not renew a permit of an entity that violates this section" as of the effective date of January 1, 2026. *Id.* § 17-92-416(c).

48.    Section 17-92-416(e) allows the Board of Pharmacy to continue "the use of a retail permit" for a limited period of time "if there is a pending sale of the pharmacy to an eligible buyer." And Section 17-92-416(d)(1) allows the Board to issue a "limited use permit" to PBMs or their affiliated pharmacies for the sale of "certain rare, orphan, or limited distribution drugs that are otherwise unavailable in the market to a patient or a

pharmacy that would otherwise be prohibited under this section." But the provision expires by its own terms on September 1, 2027. And the law allows no other exceptions.

49.    Act 624 further requires PBMs or their affiliated pharmacies currently operating in Arkansas to provide each of their patients and their patients' prescribing providers with written notice by November 2, 2025, "that the pharmacy can no longer dispense retail drugs to the patient on or after January 1, 2026." Ark. Code §17-92-417(c)(1)(A).

50.    The practical effect of Act 624 is to ban PBMs from holding a direct or indirect interest in a pharmacy operating in the state. As a corollary, no pharmacy in which a PBM has a direct or indirect interest is allowed to hold a permit or license to maintain a pharmacy for the manufacture, sale, or distribution of drugs in Arkansas. And all such mail-order pharmacies, including specialty pharmacies, must cease operating in the state beginning January 1, 2026.

**D.    In both purpose and effect, Act 624 erects a legal barrier to protect local businesses from competition by out-of-state businesses**

51.    The text, context, legislative history, and drafting history of Act 624, together with public statements concerning the Act by lawmakers, demonstrate that the principal purpose and primary effect of the Act are to protect local, in-state pharmacies from competition by out-of-state PBM pharmacies.

52.    The law's non-codified preamble states plainly that lawmakers' concern was to protect local businesses. In particular, they worried that the "business tactics" of PBMs "have driven locally-operated pharmacies out of business." Act 624 § 1(a)(2).

14

53.     Lawmakers accordingly drafted Act 624 to block competition from out-of-state PBMs and their pharmacies. Indeed, no Arkansas-domiciled company will lose a permit or license under Act 624. Only out-of-state companies will.

54.     What the law's text suggests, its drafting history confirms. Walmart is the largest employer in Arkansas; it is headquartered in Bentonville, Arkansas. Walmart owns and operates more than 100 retail pharmacies in the state. Walmart Home Delivery Pharmacy and Walmart Specialty Pharmacy also deliver drugs to Arkansans.

55.     As initially drafted, Act 624 would have revoked Walmart's pharmacy permits. In response to Walmart's objection, lawmakers introduced an amendment to the bill that ensured that Walmart—an in-state company that lawmakers did not wish to target—would not be affected by the law. Also saved from the law's application was Harps Food Stores, a large multistate grocery chain headquartered in Springdale, Arkansas, which likewise would have lost its pharmacy permits under the original bill. In adopting the amendment, lawmakers' unmistakable intent was to ensure that Act 624 would apply only to out-of-state companies, not in-state companies.

56.     The history leading up to Act 624's adoption, statements made during the hearings, and press releases immediately following its adoption likewise confirm the law's protectionist aims. For example:

a.     Representative Moore, who introduced Act 624 as H.B. 1150 in the House, explained that "a really big part of why we're running H.B. 1150" is "supporting these independent neighborhood pharmacies." PUTTcast, *Arkansas HB 1150: Combatting PBM Anticompetitive Practices with State Legislation*, at 2:27 (Feb. 5, 2025), https://perma.cc/62XX-UZ73. Around the same time, after H.B. 1150 was first introduced, Monique Whitney, the executive director of Pharmacists United for Truth and Trans-

15

parency (PUTT), called the legislation a "win for patients and local pharmacies." EIN Presswire, *PUTT: Arkansas' New Bill to Ban PBM-Owned Pharmacies From Operating In State is "A Win"* (Jan. 17, 2025), https://shorturl.at/jKZ7F.

  b. Those views were consistent with Representative Moore's statements at the April 2 house committee hearing, where he explained that he was motivated to introduce the bill because one of his close friends (indeed, a groomsman in his wedding) "has told me he may have to shut down his pharmacy and sell his family business which his father and him have built over the past several decades because of predatory pricing and reimbursement rates by these pharmacy benefit managers." April 2 House Hearing, at 11:16:26, https://perma.cc/5VYD-ZXBZ.

  c. This was a recurring theme at the April 2 hearing. For example, Representative Brandon Achor—who personally owns several independent community pharmacies across Arkansas—stated that, without regulatory intervention, "pretty soon all us small businesses would be out, and there would be one big one, and we know what's going to happen to the prices then." *Id.* at 11:41:18. Achor later asserted that the market is "rigged by corporate PBM middlemen," which are "trillion-dollar giants that squeeze independent pharmacies." Brandon Achor, Opinion, *Arkansas Democrat-Gazette* (Apr. 24, 2025), https://perma.cc/2XCB-F4TW.

  d. Representative Les Eaves at one point exclaimed at the April 2 hearing that "we have been dealing with PBMs for quite a while" and "are aware of what they are doing to our rural pharmacies." April 2 House Hearing, at 11:26:46, https://perma.cc/-5VYD-ZXBZ. John Vinson, the CEO of the Arkansas Pharmacists Association, which represents the interests of local independent pharmacies and was responsible for drafting the bill, followed up: "there are somewhere between two billion and five billion dollars of

prescriptions that are being forced through out-of-state mail-order pharmacies . . . that should be able to be filled locally." *Id.* at 11:31:52.

    e.  Similar statements were made at the April 8 senate hearing. Brandi Chane, the head of Pharmacists United for Truth and Transparency, applauded the Act's effort to "safeguard the future of independent community pharmacies," complaining that "these monopolies, PBMs, insurance companies, and pharmacy chains are all owned by the same corporate entities," which "have made it nearly impossible for small pharmacies like mine and like these guys, to survive." April 8 Senate Hearing, at 11:22:27, 11:23:30, https://perma.cc/M2DM-QC9M.

    f.  Also at the April 8 hearing, Greg Reybold, general counsel of a trade association representing over 80 independent pharmacies in Arkansas, decried the failure of "states all over the country" to rein in PBMs "because of the size of these companies, and because of the insidious relationship[s] between the PBMs and their mail order pharmacies are rotten to the core." April 8 Senate Hearing, at 10:57:03, https://perma.cc/-M2DM-QC9M. He declared that, with Act 624, "Arkansas is a critical state for independent pharmacy" and "is the center of the pharmacy universe" because of the legislation. *Id.* at 10:54:20.

    g.  Senator Hammer, the Act's lead Senate sponsor, stated in a podcast recorded at the time that lawmakers were deliberating on Act 624 that Arkansas is engaged in a "battle" and "chess match" that has pitted "pharmacies that are independent" against "pharmacies that are owned by PBMs." He expressed worry that an "independent pharmacy in my county, in my city, went out of business" because of competition from PBM pharmacies. PUTTcast, *Arkansas HB 1150: Combatting PBM Anticompetitive Practices with State Legislation*, at 6:30-7:36, https://perma.cc/62XX-UZ73.

h.    Similar sentiments were shared after the bill was signed. Attorney General Tim Griffin expressed worry in a press release that PBMs and their pharmacies have been "crushing independent pharmacies" in local markets. Press Release, *Sanders Signs Legislation to Ban Anti-Competitive PBM Practices* (Apr. 16, 2025), https://-perma.cc/B7KG-6FEK. The same press release, which was issued by Governor Sanders's office on the occasion of the Act's signing, quoted a supporter for his thanks that now Arkansans "are finally able to get their medication locally" rather than having "to use an out of state mail order pharmacy." *Id.* In the same release, John Vinson praised the Act for "level[ing] the playing field for local pharmacists." *Id.*

57.    These statements demonstrate beyond fair-minded debate that the central purpose of Act 624 was to protect local independent pharmacies from competition from out-of-state PBMs and their affiliated pharmacies.

**E.    Act 624 inflicts legislative punishment on a discrete and specifically targeted group of companies for asserted violations of law**

58.    Not only does Act 624 set out to protect local businesses from competition by out-of-state businesses, but it also aims to punish a discrete population of companies for perceived misconduct.

59.    To begin, the text and context of Act 624 leave no doubt that the law is designed to punish PBMs for what lawmakers have alleged is their blameworthy "anti-competitive" and "monopolistic" conduct. The theme that appeared in the law's plain language, at the legislative hearings, and in statements to the press was consistent: Law-makers (wrongly) allege that PBMs have abused their market position to reimburse their own pharmacies more than what they reimburse independent pharmacies, which has driven independent pharmacies out of business. For instance:

a.    The preamble to the Act accuses PBMs and their affiliated pharmacies of "anticompetitive business tactics that have driven locally-operated pharmacies out of business," explaining that "[t]he State of Arkansas wishes to minimize conflicts of interest by stopping the pharmacy benefits managers acting as a 'fox guarding the henhouse' by being both a price setter and price taker." Act 624 § 1(a)(2)-(3).

b.    At the April 2 house committee hearing, Representative Moore described PBMs as "predatory" and "criminally capitalistic" because they "reimburse their competitors while they reimburse themselves." April 2 House Hearing, at 11:13:48, https://perma.cc/5VYD-ZXBZ. Consistent with the view, Moore later explained that Act 624 is designed to bar "vertical integration regarding an industry in which [PBMs] are responsible for setting the prices of their competitors." *Id.* at 11:26:07.

c.    At the same hearing, Representative Achor stated that "it is unbelievable to me that one organization can set the prices of its competitor," prompting Vinson to invoke "Teddy Roosevelt, [who] was the original trust-buster who said, 'We should not allow this to happen to small American businesses.'" Vinson continued: "We should not allow this to happen in Arkansas, but it's happening. . . . We have states' rights to prohibit monopolies." *Id.* at 11:40:56.

d.    At the same hearing, Vinson asserted that "there have been a net loss of 65 pharmacies, and more than 20 in the last 12 months, because of unfair competition." *Id.* at 11:31:35. He explained that PBMs are paying "out-of-state mail-order pharmacies" more than they are paying local pharmacies. *Id.* at 11:31:52.

e.    Representative Jack Ladyman, speaking in support of the bill, was even more direct in his indictment of PBMs and their affiliated pharmacies: "If it looks like a monopoly and smells like a monopoly, it might actually be a monopoly." *Id.* at 11:28:45.

19

   f. In an opinion piece published in support of Act 624, Senator Mark Johnson stated that the bill would "eliminate a glaring conflict of interest that has long favored corporate PBM profits at the expense of patients and local pharmacies." Mark Johnson, Opinion, *Arkansas Democrat-Gazette* (Mar. 2, 2025), https://perma.cc/TBD5-5NJS. Senator Johnson affirmed the bill's intent to avoid "consolidating control in the hands of a few massive out-of-state PBM corporations." *Id.*

   g. In her press release at the time of the Act's signing, Governor Sanders was equally direct, declaring that "[t]hese massive corporations are attacking our state because we will be the first in the country to hold them accountable for their anti-competitive actions." Press Release, *Sanders Signs Legislation to Ban Anti-Competitive PBM Practices* (Apr. 16, 2025), https://perma.cc/B7KG-6FEK. And in the same release, Senator Hammer described Act 624 as a response to "monopolistic action of bad actors in the PBM arena." *Id.*

  60. To be clear, PCMA's members and Navitus unequivocally deny that they have violated any of the antitrust laws. But with Act 624, lawmakers effectively have treated PBMs and their pharmacies as though they are guilty of antitrust violations, without a trial. Indeed, Senator Irvin noted that there had been no legal determination of unlawful monopolistic conduct and complained that her fellow legislators could not "hold someone to a standard with our Arkansas constitution that is just based on your opinion." April 8 Senate Hearing, at 11:17:09, 11:52:16, 12:23:14, https://perma.cc/M2DM-QC9M. Senator Irvin voiced opposition to the bill and revealed its true intent, stating that it was "using government to deny a business to operate," to say "we are getting rid of your competition," and essentially "using the government in an anticompetitive way to pick winners and losers." *Id.* at 11:13:23.

61.    Lawmakers' repeated (and mistaken) assertion that PBMs are engaged in predatory and "monopolistic" conduct has furnished one of Arkansas's bases for imposing punishment on them. Section 4-75-302 of the Arkansas Code specifies that "[a] monopoly . . . is declared to be unlawful and against public policy" and subject to punishment. And Section 4-75-209(a)(1) separately forbids anyone from selling goods below cost to destroy competition, while Section 4-88-107 more generally outlaws "unconscionable trade practices."

62.    Act 624 is intended to punish—and if it is allowed to go into effect, it will punish—legislatively implied violations of Sections 4-75-302, 4-75-209(a)(1), 4-88-107, and related state and federal laws. It will do so by revoking permits and licenses to operate as pharmacies from any pharmacies that are affiliated with a PBM. But Arkansas has never formally alleged in any judicial proceeding that that PCMA's members or Navitus has violated these laws, and such allegations would not hold up in court if ever it did.

63.    Another repeated theme throughout the hearings and press coverage of Act 624 was that PBMs allegedly reimburse their affiliated pharmacies greater amounts than they reimburse independent pharmacies for the same drugs and services. In his introductory statement at the April 2 house committee hearing, for example, Representative Moore cited one "quite damning" example—albeit one unsupported by evidence—in which PBMs supposedly "reimburse independent pharmacies $97 while reimbursing their own pharmacies $19,200 for the exact same drug." April 2 House Hearing, at 11:14:36, https://perma.cc/5VYD-ZXBZ. And at the later April 8 Senate Hearing, Senator Irvin asked: "You know that it is against the law in the state of Arkansas for a PBM-affiliate pharmacy to pay themselves more than an independent pharmacy, correct?" April 8 Senate Hearing at 11:04:02 AM, https://perma.cc/M2DM-QC9M.

21

64.    The repeated (and again mistaken) assertion that PBMs reimburse their affiliated pharmacies greater amounts than they reimburse local independent pharmacies has furnished one of Arkansas's bases for imposing punishment on them. Arkansas Code § 17-92-507(d)(1) specifies that "[a] pharmacy benefits manager shall not reimburse a pharmacy or pharmacist in the state an amount less than the amount that the pharmacy benefits manager reimburses a pharmacy benefits manager affiliate for providing the same pharmacist services." *Accord* Ark. Code § 23-92-506(b)(4)(A).

65.    Act 624 is intended to punish—and if it is allowed to go into effect, it will punish—legislatively implied violations of Sections 17-92-507(d)(1) and 23-92-506-(b)(4)(A). It will do so by revoking permits and licenses to operate as pharmacies from any pharmacies that are affiliated with a PBM. Once again, however, Arkansas has never formally alleged in any judicial proceeding that PCMA's members or Navitus has violated these laws, and such allegations would not hold up in court if ever it did.

### F.    Act 624 will inflict textbook irreparable harms

66.    Enforcement of Act 624—even just the prospect of enforcement—will inflict enormous and irreparable harms on PCMA's members and Navitus. Already, Arkansans have begun transferring prescriptions from PBM pharmacies to local pharmacy chains and independent pharmacies, precisely as lawmakers have intended. Terminations by the thousands of longstanding pharmacy-patient and pharmacy-provider relationships will result in an irremediable loss of business and goodwill for PCMA's members and Navitus. Just consider Section 17-92-417(c)(l)(A), which directs PBM pharmacies, by November 2, 2025, to "provide written notice ... to each patient and each patient's prescribing healthcare provider that has used the pharmacy within the previous twelve ... months that the pharmacy can no longer dispense retail drugs to the patient on or after January 1,

22

2026." This notice will lead to the permanent loss of many customers in the state.

67.    Of course, once the permits and licenses held by PCMA's members, Navitus, and their affiliated pharmacies are revoked, the loss of those relationships will be unavoidable. PCMA's members will have to close retail stores in the state and lay off employees. The law will lead to the closures of more than 40 retail pharmacies, resulting in more than 600 job losses. April 8 Senate Hearing, at 11:41:03, https://perma.cc/M2DM-QC9M (statement of Randy Zook, Arkansas Chamber of Commerce). Impacted mail-order pharmacies will have to relinquish long-established business relationships, losing revenues and ongoing relationships well into the future.

68.    The reputational damage and the destruction of longstanding business relationships inflicted by Act 624 are textbook irreparable harms. Even if their permits and licenses were restored after Act 624 comes into effect, many PBMs' lost patient and business relationships would not return. The damage to PBMs' reputations also would be permanent.

69.    Regardless of their permanence, injuries like these cannot be remedied with awards of damages. And even if they could be in theory (they cannot), the Board of Pharmacy is entitled to sovereign immunity. When a harm arises from illegitimate state regulation, an aggrieved party typically "cannot recoup [its] financial loss through a damages award because of sovereign immunity." *Missouri v. Trump*, 128 F.4th 979, 996 (8th Cir. 2025) (citing *Iowa Utilities Board v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996)). *Cf. Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-221 (1994) (Scalia, J., concurring) ("compliance costs" of "a regulation later held invalid almost always produces the irreparable harm" because they are by definition not recoverable).

70.     The public interest also favors a preliminary injunction. Under Act 624, patients in need of health-sustaining and life-saving drugs and therapeutics will have their care disrupted. If they are able to reestablish supplies of their drugs, they will do so at greater expense and inconvenience. Patient adherence to drug regimens will decrease, leading to worse health outcomes and higher healthcare costs.

### CAUSES OF ACTION

#### Count 1:
#### Unconstitutional Economic Protectionism

71.     Plaintiffs incorporate and re-allege paragraphs 1 through 72 as if fully set forth herein.

72.     Act 624 is a clearcut example of unconstitutional economic protectionism, violating the foundational constitutional rule that states may not enact laws to benefit in-state economic interests by burdening out-of-state competitors. This principle is reflected in both the Dormant Commerce Clause and the Privileges and Immunities Clause, which together safeguard the national economic union and the right of citizens to pursue their trade and occupation across state lines.

73.     Most obviously, Act 624 violates the Commerce Clause of article I, section 8 of the U.S. Constitution. "[S]tate laws offend the Commerce Clause when they seek to build up domestic commerce through burdens upon the industry and business of other States." *National Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) (cleaned up) (quoting *Guy v. Baltimore*, 100 U.S. 434, 443 (1880)). The Commerce Clause thus "prohibits the enforcement of state laws 'driven by ... economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state

24

competitors.'" *Id.* (quoting *Department of Revenue of Kentucky v. Davis*, 553 U.S. 328, 337–338 (2008)).

74.     "A state law that is challenged on dormant Commerce Clause grounds is subject to a two-tiered analysis." *South Dakota Farm Bureau v. Hazeltine*, 340 F.3d 583, 593 (8th Cir. 2003). "First, if the state law discriminates against interstate commerce—facially, in purpose or in effect—it will be invalidated unless the state can show, 'under rigorous scrutiny, that it has no other means to advance a legitimate local interest.'" *IESI AR Corp. v. Northwest Arkansas Regional Solid Waste Management District*, 433 F.3d 600, 604 (8th Cir. 2006). A law is discriminatory in this sense when it gives "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *South Dakota Farm Bureau*, 340 F.3d at 593 (quoting *Oregon Waste Systems Inc. v. Department of Environmental Quality*, 511 U.S. 93, 99 (1994)).

75.     Act 624 is discriminatory in all respects: it treats in-state and out-of-state companies differently, benefitting the former at the expense of the latter. No company domiciled or headquartered in Arkansas will be denied a permit or a license by Act 624. As originally introduced, the law would have denied pharmacy permits to Walmart and Harps Food Stores, large in-state companies. But lawmakers accordingly amended the law to ensure that would not happen.

76.     By purpose and design, and in practice and effect, Act 624 applies only to, and thus discriminates against, out-of-state companies. All PBM mail-order and specialty pharmacies that will lose their permits or licenses under Act 624 operate outside of Arkansas and ship drugs into the state. More generally, no company that will lose or be denied a permit or license by Act 624 is domiciled or headquartered in Arkansas.

25

77.    Act 624 also violates the Privileges and Immunities Clause of article IV, section 2 of the U.S. Constitution. The Privileges and Immunities Clause, as a complement to the dormant aspect of the Commerce Clause, "protects the right of citizens to 'ply their trade, practice their occupation, or pursue a common calling'" free from improper local protectionism. *McBurney v. Young*, 569 U.S. 221, 227 (2013) (quoting *Hicklin v. Orbeck*, 437 U.S. 518, 524 (1978)). Thus, when a state law bars certain persons from "the privilege of pursuing a common calling" by, for instance, denying a permit or license; and when the law is demonstrably "enacted for the protectionist purpose of burdening out-of-state citizens," the law violates the Privileges and Immunities Clause. *Id.*

78.    "Whether differential treatment of out-of-state residents violates [the Privileges and Immunities Clause] involves a two-part inquiry: (1) whether the state's law discriminates against out-of-state residents with regard to a privilege or immunity protected by the Clause, and (2) if so, whether sufficient justification exists for the discrimination." *Minnesota ex rel. Hatch v. Hoeven*, 456 F.3d 826, 834 (8th Cir. 2006); *accord Lunding v. New York Tax Appeals Tribunal*, 522 U.S. 287, 298 (1998).

79.    Act 624 denies out-of-state PBMs, their pharmacies, and by extension their officers, employees, and shareholders, the privilege of engaging in the pharmacy business in Arkansas, for the express purpose of advantaging local competitors. This discrimination is not justified by any legitimate, non-protectionist local interest. Even if the state could articulate such an interest, the means chosen—categorically excluding out-of-state PBM-affiliated pharmacies—are not substantially related to the achievement of that interest and are far more restrictive than necessary.

80.    Every mail-order pharmacy must "have on staff in the out-of-state pharmacy an Arkansas-licensed pharmacist, who shall be designated the pharmacist-in-charge for the

Arkansas out-of-state pharmacy license." Ark. Code. § 17-92-401(b)(1). By requiring the denial or revocation of licenses that otherwise would be held under Section 17-92-401(a), Act 624 deprives every supervising pharmacist presently working for an out-of-state, PBM-associated pharmacy the privilege of practicing pharmacy for prescriptions mailed into Arkansas, simply because they work for an out-of-state PBM mail-order pharmacy.

81.    Beyond that, it is no answer to say that corporations are not entitled to the protections of the Privileges and Immunities Clause. Since the early days of the Union, diversity jurisdiction has depended on the idea that "corporations composed of citizens are considered by the legislature as citizens" under ordinary circumstances. *Bank of the United States v. Deveaux*, 9 U.S. (5 Cranch) 61, 91 (1809), overruled on other grounds by *Louisville, Cincinnati, and Charleston Railroad Co. v. Letson*, 43 U.S. 497 (1844). As the Supreme Court more recently explained, the modern law of corporations "specifies the rights and obligations of the *people* (including shareholders, officers, and employees) who are associated with a corporation," and "[w]hen rights, whether constitutional or statutory, are extended to corporations, the purpose is to protect the rights of these people." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706-707 (2014).

82.    Just so here. Many of the shareholders, officers, and employees of PCMA's members and Navitus and their affiliated pharmacies are citizens of the United States. To deny PCMA's members and Navitus the privilege of holding an interest in a pharmacy permit, directly or indirectly through an affiliated pharmacy, is to deny those shareholders, officers, and employees of that privilege. The modern reality is that for citizens to practice a trade or profession, the corporation for which they work or with which they associate often must hold a state-issued permit or license to operate in the relevant market. To deny

the corporation a license or permit is thus to deny the privilege of practicing the trade or profession to the citizen as a practical matter.[1]

83.    Even if Act 624 were not discriminatory in violation of the Commerce Clause and Privileges and Immunities Clause, it would fail under the balancing test of *Pike v. Bruce Church*, 397 U.S. 137 (1970). "If [a] law is not discriminatory," a state law still may fail Commerce Clause scrutiny if "the burden it imposes on interstate commerce 'is clearly excessive in relation to its putative local benefits.'" *South Dakota Farm Bureau*, 340 F.3d at 593 (quoting *Pike*, 397 U.S. at 142).

84.    Act 624 will place an enormous burden on interstate commerce by barring any PBM pharmacies from delivering drugs by mail. It also will require the closure of nearly 40 retail pharmacies. Together, these pharmacies fill many hundreds of thousands of prescriptions per year for Arkansans. And the markets for pharmaceutical distribution, dispensing, and reimbursement are all quintessentially interstate.

85.    Act 624 will achieve little or no offsetting local benefits; indeed, it is likely to inflict crushing local harm. Propping up local businesses at the expense of out-of-state businesses is not a cognizable benefit under the Commerce Clause. And the shuttering of dozens of pharmacies across the state will create widespread confusion among Arkansans

---

[1]    There is precedent to the contrary. *See Sarasota Wine Market, LLC v. Schmitt*, 987 F.3d 1171, 1179 (8th Cir. 2021); *Hemphill v. Orloff*, 277 U.S. 537, 548 (1928). These precedents have doubtful continuing validity and warrant revisiting by the Supreme Court. *Cf. National Pork Producers' Council*, 598 U.S. at 370 (in a suit by a trade association comprised of corporate members, noting that "the antidiscrimination principle" of the dormant Commerce Clause "may be more appropriately housed elsewhere in the Constitution," including "in the Privileges and Immunities Clause"); *id.* at 409 (Kavanaugh, J., concurring in part) ("one State's efforts to effectively regulate farming, manufacturing, or production in other States could raise significant questions under" the "Privileges and Immunities Clause").

in need of prescription drugs, disrupting their health-sustaining care. The disruption will be especially acute for those who depend on specialty pharmacies for highly sensitive and costly drugs. One hearing witness acknowledged, moreover, the Act 624 may mean that rural Arkansans have no access to a retail pharmacy at all. April 8 Senate Hearing, at 11:24:23, https://perma.cc/M2DM-QC9M (statement of Jason Finley).

86.    Whatever purported benefits Act 624 may achieve can be achieved by other means that do not directly burden interstate commerce. For example, Section 17-92-507 already prohibits PBMs from reimbursing independent pharmacies lower amounts than affiliated pharmacies, and violation of that provision is a basis for suspending a PBM's license to operate in the state. More generally, PBMs and their pharmacies must comply with all state laws of general application, including contract laws, consumer protection laws, unfair trade practices statutes, antitrust laws, privacy laws, and so on.

87.    The constitutional prohibition on economic protectionism is not a technicality, but a central feature of the federal system. By enacting Act 624, Arkansas has violated both the letter and the spirit of the Constitution's safeguards against state-imposed economic Balkanization.

88.    Act 624 is thus invalid under the Commerce Clause because it is intended to discriminate against interstate commerce; it discriminates in practice and effect against interstate commerce; and its burdens on interstate commerce vastly outweigh any local benefits, which can be achieved by other less burdensome means. It further violates the Privileges and Immunities Clause because, in design and by purpose, it denies only out-of-state citizens the state-sanctioned privilege of engaging in the prescription-drug trade in Arkansas. In short, it was enacted for protectionist purposes.

89.     Accordingly, Act 624 must be declared unlawful and its enforcement en-

joined as a violation of the constitutional prohibition on economic protectionism.

### Count 2:
### Unconstitutional Bill of Attainder

90.     Plaintiffs incorporate and re-allege paragraphs 1 through 92 as if fully set

forth herein.

91.     Act 624 violates the Bill of Attainder Clause of article I, section 10 of the

U.S. Constitution.

92.     "No State shall . . . pass any Bill of Attainder." U.S. Const. art. I, § 10, cl. 1.

This clause bars "legislative punishment, of any form or severity, of specifically designated

persons or groups." *United States v. Brown*, 381 U.S. 437, 447 (1965). It is "a general

safeguard against legislative exercise of the judicial function, or more simply—trial by

legislature." *Id.* at 442.

93.     Act 624 is an unconstitutional bill of attainder because it (1) singles out

PBMs and their affiliated pharmacies based on past conduct wrongly characterized as

regulatory and statutory law violations and (2) imposes punishment on them (3) without a

judicial trial. *See Palmer v. Clarke*, 408 F.3d 423,433 (8th Cir. 2005).

94.     An enactment sufficiently designates or singles out a group of persons "if it

describes the individual 'in terms of conduct.'" *Palmer*, 408 F.3d at 443 (quoting

*Communist Party v. Subversive Activities Control Board*, 367 U.S. 1, 86 (1961)). Here, the

legislature singled out PBMs as a narrowly defined and discrete class based on their past

conduct. In particular, it narrowed application of the law to PBMs that (1) hold a direct or

indirect interest in a pharmacy permit and (2) allegedly used their position as "both a price

setter and a price taker" to engage in "anticompetitive business tactics," including paying PBM pharmacies more than independent pharmacies. Act 624 § 1(a).

95.    Traditional types of legislative penalties include "banishment" and "barring designated individuals or groups from participation in specified employments or vocations," such as "barring clergymen from ministry" or disqualifying individuals "from Government employment." *Nixon v. Administrator of General Services*, 433 U.S. 425, 474-475 (1977). "[P]unishment is not restricted purely to retribution for past events" and "may include inflicting deprivations . . . to prevent [] future misconduct." *Nixon*, 433 U.S. at 476 n.40. Here, Arkansas has effectively banished PBM pharmacies from the state. It has also categorically deprived them of the privilege to practice their vocation in the state. These are punishments within the meaning of the Bill of Attainder Clause.

96.    No judicial proceeding was furnished. When the holder of a permit or license to operate a pharmacy in the state is accused of regulatory or other legal infractions, it must be accorded an administrative or judicial hearing before its permit or license may be revoked. Similarly, a vertically integrated enterprise ordinarily would have the benefit of a trial before being ordered by a court to unwind the integration. Here, the legislature has inflicted such punishments for asserted violations by legislative action rather than through administrative or judicial proceedings.

97.    Act 624 is invalid under the Bill of Attainder Clause because it inflicts punishments for asserted blameworthy conduct by legislative rather than judicial means. It must be declared unlawful, and its enforcement must be enjoined.

31

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray this Court:

a)  declare that Act 624 constitutes unconstitutional economic protectionism in violation of the Dormant Commerce Clause and, in the alternative, the Privileges and Immunities Clause of the United States Constitution;

b)  declare that Act 624 violates the Bill of Attainder Clause of the United States Constitution;

c)  grant preliminary and permanent relief enjoining defendants and their agents or successors from taking any action to implement or enforce Act 624;

d)  award plaintiff attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b) and any other applicable provision of law;

e)  award any and all other relief that the Court determines just and proper.

Dated: June 9, 2025

David S. Mitchell, Jr. (Ark. Bar No. 2010271)
  ROSE LAW FIRM,
  A PROFESSIONAL ASSOCIATION
  120 East Fourth Street
  Little Rock, AR 72201
  (501) 375-9131
  dmitchell@roselawfirm.com

Tyler D. Mlakar (Ark. Bar No. 2022150)
  ROSE LAW FIRM,
  A PROFESSIONAL ASSOCIATION
  809 S. 52nd St., Ste. A
  Rogers, AR 72758
  (479) 301-2444
  tmlakar@roselawfirm.com

Respectfully submitted,

/s/ *Michael B. Kimberly*

Michael B. Kimberly*
Linda M. Blair*
  WINSTON & STRAWN LLP
  1901 L Street NW
  Washington, DC 20036
  (202) 282-5096
  mkimberly@winston.com
  lblair@winston.com

* *pro hac vice* motion forthcoming